UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br> v. <br> JONATHON ORTINO, <br> Defendant. | Case No. 19-cr-00142-WHO-1 <br><br> **ORDER DENYING MOTION TO SUPPRESS STATEMENTS** <br><br> Re: Dkt. No. 30 |

## INTRODUCTION

Defendant Johnathon Ortino, a Department of Homeland Security (DHS) employee with Customs and Border Patrol (CBP), moves to suppress statements he made to the DHS Office of Inspector General ("DHS OIG") because DHS OIG officials interviewed him without advising him that he could assert his right to remain silent without being penalized by termination or discipline in accordance with *Garrity v. New Jersey*, 385 U.S. 493 (1967). They did advise him of his *Miranda* rights, but Ortino argues that both *Miranda* and *Garrity* warnings were required.

I find that Ortino's belief that he was compelled to answer DHS OIG's questions under threat of termination is not objectively reasonable. DHS Management Directive 810.1 prohibits CBP from disciplining an employee who refuses to cooperate with DHS OIG when the employee is the subject of an investigation that could lead to criminal prosecution. Ortino knew that he was facing criminal consequences prior to the interview: he surrendered his service weapon, was placed under arrest, and received his *Miranda* warning. The government did not implicitly or explicitly compel him to answer questions. His motion to suppress is DENIED.

**BACKGROUND**

**I.     FACTUAL BACKGROUND**

   **A.     Underlying Investigation**

Ortino was a DHS CBP officer and an elected president of the National Treasury Employees Union ("Union") Chapter 165. Superseding Indictment [Dkt. No. 13] ¶ 1. As Union president, he had an obligation to file the Union's Form LM-3 Labor Organization Annual Report ("Form LM-3") with the Department of Labor ("DOL"). *Id.* ¶ 2. According to the Superseding Indictment, Ortino used the Union's bank account for his own private expenses and made online transfers from it to his and his other associates' private bank accounts. *Id.* ¶ 17. He allegedly filed a false Form LM-3 in 2014, 2015, and 2016 for the Union that concealed this activity. *Id.* ¶ 10.

Another CBP officer defeated Ortino in the Union's presidential election on September 12, 2017. Opposition to Motion to Suppress ("Oppo.") [Dkt. No. 33] 3. According to the government, this led to Ortino's confrontations with Anad Muni, the newly-elected Union president, and Bryan Vann, the Union's former-vice president while he was president. *Id.* Ortino allegedly threatened Vann at a bar, shoved Vann to provoke a fight, and when Vann refused to hit him, called Vann a racial slur. *Id.* CBP issued an internal "memorandum of instruction," informing Ortino that his confrontation with Vann was unacceptable and should not be repeated. *Id.*; Declaration of Richard DiNucci in Support of Opposition ("DiNucci Decl.") [Dkt. No. 33-2] ¶ 2.

Ortino's supervisor, Port Director Richard DiNucci, claims that Ortino told him that he was concerned about losing work opportunities because of his confrontation with Vann. DiNucci Decl. ¶ 3. DiNucci contends that Ortino asked for a meeting several times, and that DiNucci coordinated the date, time and location of the meeting with DHS OIG Special Agent Janet Roberson because he knew that she also wanted to speak with Ortino. *Id.* ¶¶ 4–5.

Ortino asserts that he did not initiate the meeting request and rather, on March 31, 2019, DiNucci directed him to appear for a meeting on April 2, 2019 to "get the air cleared on the Vann thing." Declaration of Johnathon Ortino in Support of Motion to Suppress ("Ortino Decl.) [Dkt No. 32] ¶ 3 & Ex. A (email exchange between Ortino and DiNucci). Ortino asked if there was any

cause for concern and whether he should bring a union representative. *Id.* DiNucci replied, "No need for a rep unless you want one. I wanted to clear that up face to face." *Id.* Ortino notes that this email exchange occurred just a few days after the government obtained its initial indictment under seal, charging Ortino with three counts of false statement. Indictment [Dkt. No. 1].

### B. Meeting with Supervisor DiNucci

Upon his arrival, Ortino claims that DiNucci informed him that the real reason he was there was to talk to DHS OIG and DOL agents. Ortino Decl. ¶ 4. He responded that he did not want to talk to the agents that day because he had to take care of other things before leaving for vacation the next day. *Id.* He states that he requested rescheduling the meeting to the following week but DiNucci told him that he "had to talk to the agents that day, and that [he] could not leave." *Id.* DiNucci told him to "be honest" with the agents.

DiNucci remembers the conversation somewhat differently. He says that he "explicitly told [Ortino] that he did not have to talk if he did not want to do so and that it was his choice whether or not to talk to the OIG." DiNucci Decl. ¶ 10. He also told him that "if he did decide to talk he should tell the truth and that he should get a lawyer if he wanted one." *Id.* He contends that he never told Ortino that he had to cooperate with DHS OIG and never threatened to punish Ortino if he did not cooperate with DHS OIG. *Id.* ¶ 9.

Both parties agree on the sequence of events that followed. DiNucci asked Ortino to surrender his service weapon and took him to a different room, where three agents were waiting. Ortino Decl. ¶ 5; DiNucci Decl. ¶ 8. The three agents told Ortino he was under arrest and read him his *Miranda* rights. *Id.* DHS OIG Special Agent Janet Roberson and DOL Special Agent Laura Lawrence then arrived and began questioning him. *Id.*

### C. DHS OIG Interviews Ortino Without Providing A *Garrity* Warning.

Ortino claims that Roberson also read him at least part of his rights and began questioning him while Lawrence took notes on a laptop computer and occasionally asked questions. Ortino Decl. ¶ 5. At some point during the questioning, Roberson asked Ortino to sign a *Miranda* waiver, which he did. *Id.* That form advised Ortino that he had the right to remain silent and the right to an attorney, and that he may waive both of these rights and "answer questions or make a statement

3

without consulting an attorney if you so desire." Declaration of Christina E. Urhausen in Support of Motion to Suppress ("Urhausen Decl.") [Dkt. No. 31], Ex. I (*Miranda* waiver signed by Ortino on April 2, 2019). The agents questioned him about his employment history, his activities as Union president, his banking habits, an item-by-item review of expenses reflected in the union bank account, withdrawal and transfers, debit card purchases, the process of preparing forms for DOL and other topics. Mot. 7; Urhausen Decl., Ex. J (DOL interview report of Ortino).

Roberson states that when Ortino signed the *Miranda* waiver, he told both her and Lawrence that he "just wants to be honest" and to explain everything. Declaration of Janet Roberson in Support of Opposition ("Roberson Decl.") [Dkt. No. 33-3] ¶ 4. She also asserts that she and Lawrence told him "several times that he did not have to continue his post-arrest interview or answer [their] questions and that he could call an attorney," but he "always voluntarily chose to continue his interview." *Id.* ¶ 7. She contends that Ortino never asked if he would face any employment consequences. *Id.* ¶ 8. Ortino allegedly said that he was "ashamed of what happened and why it happened" and that the wire transfers from the Union account were his "fault" not the other CBP employees. *Id.* ¶¶ 9–10. He allegedly pleaded, "You guys have no idea what it feels like to go to bed every night thinking about this and waking up every morning thinking about this." *Id.* ¶ 10.

The agents did not give him the *Garrity* warning. They did give *Garrity* warnings to four other CBP employees interviewed about this matter. *See* Urhausen Decl., Exs. B, D–F (DOL interview reports of Vann, Kobashigawa, Le, and Papageorge). Ortino notes that the agents arrived late to his interview because they were interviewing another CBP employee who received a *Garrity* warning. *Id.*, Ex. C (DOL interview report of Lewin, dated April 2, 2019).

### D. DHS OIG's Instruction on *Garrity* Warnings

#### 1. DHS OIG Special Agent Handbook

The *Garrity* form that the agents allegedly used for other CBP employees comes from the DHS OIG Special Agent Handbook. Urhausen Decl., Ex. G (DHS OIG Special Handbook, 2007-

4

2017) (hereinafter "Handbook") at Chapter 10, Page 1).[1] The "INV Form 27, Federal Employee Warning Form (Garrity)" expressly warns a DHS employee being questioned that:

> Although you would normally be expected to answer questions regarding your official duties, in this instance you are not required to do so. Your refusal to answer solely on the grounds that your answer may tend to incriminate you, will not subject you to disciplinary action.

Handbook at Chapter 10, Page 14, Exhibit 10-3. Ortino argues that the agents were required to provide him with a *Garrity* warning because the Handbook states that "all employee subjects will initially be provided with *Garrity* warnings." Mot. 6.

The Handbook recognizes that "DHS employees are generally required to assist investigators in the performance of their official duties," and "can be compelled to cooperate" under the Inspector General Act, 5 U.S.C.A., App. 3, the DHS Management Directive 810.1, and the Secretary's April 8, 2008 memorandum on cooperation with the OIG. Handbook at Chapter 10, Page 1. However, the DHS Management Directive states that employees will "[b]e subject to disciplinary action for refusing to provide documents or information or to answer questions posed by investigating officials . . . *unless questioned as the subject of an investigation that can lead to criminal prosecution*." Urhausen Decl., Ex. L (copy of DHS Management Directive 810.01 at Section V.B.5) (emphasis added).

The Handbook also advises that "a DHS employee who has foreseeable criminal exposure will not be compelled under that Standards of Conduct to cooperate in an investigation. Any compelled statement obtained would not be admissible in a criminal proceeding against the employee." Handbook at Chapter 10, Page 2. It recognizes that it is "beyond the scope of this manual to list and explain every circumstance and condition under which the advisement of rights comes into play," but provides general guidelines about the minimum requirements in different circumstances. Handbook at Chapter 10, Page 6. Pertinent to the facts in this case, the Handbook

---

[1] Ortino's exhibit to the court is a copy of the DHS OIG Special Agent Handbook in effect from 2007–2017 that DHS produced pursuant to a Freedom of Information Act request and that appears online. Mot. 5, n.1. Ortino states that he made a discovery request to the government for the version of the Handbook in effect at the time of his interview in April 2019. *Id.* The parties are continuing to meet and confer over the production of the current version. *Id.*

provides that:

- In a situation where the "[s]ubject is in custody or under arrest and is an employee," the Handbook finds "Miranda rights [are] required."
- In a situation where the "[s]ubject is in custody on a matter other than what you are investigating, is an employee, and has foreseeable criminal exposure in your investigation," the Handbook finds both "Garrity warning. . . [and] Miranda rights [are] required."
- In a situation where the "[s]ubject is not in custody but is a DHS employee and has foreseeable criminal exposure," the Handbook finds a "Garrity warning is required."

*Id.* at Chapter 10, Page 7. As Ortino points out in his motion, the Handbook could be read to exclude employees in custody from receiving *Garrity* warnings, unless they are in custody "on a matter other than what [the agent is] investigating." Mot. 9. In this case, it appears that Agent Roberson followed the Handbook's guidance – Ortino was only given a *Miranda* warning, and not an additional *Garrity* warning, because he was in custody on the matter for which DHS OIG was investigating him. The other CBP employees were only given *Garrity* warnings because they were not in custody.

### 2. Assistant Attorney General Memorandum

Ortino cites additional evidence that he argues shows that agents were required to give him a *Garrity* warning. On May 6, 2005, Assistant Attorney General ("AAG") Christopher A. Wray issued a memorandum entitled "The Increasing Role of the Offices of Inspector General, and Uniform Advice of Rights Forms for Interviews of Government Employees." Urhausen Decl., Ex. A (AAG Wray Memorandum). It recommended that OIG agents provide *Garrity* warnings in all interviews with employees, and to provide an additional *Miranda* warning in custodial interviews:

> [W]hen a federal employee is interviewed during the course of an investigation being conducted by an Office of Inspector General, the agents should provide the employee with an advice of rights form that is designed to preserve the government's ability to use the employee's statements by advising the employee that the interview is voluntary and that the employee will not be disciplined solely for refusing to answer questions . . . In custodial interviews, of course, the employee should also be provided with *Miranda* warnings.

6

*Id.*

Subsequently, on January 11, 2006, AAG Alice S. Fisher, issued another memorandum to clarify the AAG Wray Memorandum. Oppo., Ex. A (AAG Fisher Memorandum). AAG Fisher stated that "the Wray memorandum encouraged the use of *Garrity* warnings whenever inspector general agents conduct interviews of government employees," in order to minimize the risk of "taint[ing] the entire investigation or prosecution." She explained:

> The Wray memorandum was not intended to undermine or change the existing authority of the Offices of Inspector General to exercise their professional judgment regarding specific circumstances under which *Garrity* warnings must be given.

*Id.* That is why, the government argues, the DHS OIG Special Agent Handbook suggests that a *Garrity* warning is not needed when a DHS employee is in custody on the matter for which they are investigating. Ortino responds that the government's interpretation of *Garrity* misapplies the law and is not binding. Mot 10.

## II. PROCEDURAL HISTORY

On March 26, 2019, the government filed the initial indictment against Ortino for three counts of false statements arising out of the DOL forms he submitted as Union president. Indictment [Dkt. No. 1]. On June 4, 2019, after agents interviewed him on April 2, 2019, the government obtained a Superseding Indictment against him and added three wire fraud charges to the prior false statement charges. Superseding Indictment [Dkt. No. 13].

On October 3, 2019, Ortino moved to suppress the statements he made at the interview, along with any evidence derived from those statements. I heard oral argument on November 14, 2019.

## LEGAL STANDARD

### I. FIFTH AMENDMENT PRIVILEGE

As a general rule, "[i]f [an individual] desires the protection of the [Fifth Amendment] privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *United States v. Saechao*, 418 F.3d 1073, 1077 (9th Cir. 2005) (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943)) (internal quotation marks omitted).

There are, however, exceptions to this rule. The Supreme Court has held that if an individual is subjected to a practice that "den[ies him] . . . a free choice to admit, to deny, or to refuse to answer," then any statement he makes is considered involuntary and cannot be used in a criminal proceeding. *Garner v. United States*, 424 U.S. 648, 657 (1976) (internal quotation marks and citation omitted). In these cases, the Fifth Amendment is considered "self-executing," and an individual does not need to invoke it in order to have his admissions suppressed in an ensuing criminal prosecution. *Id.*

One instance in which an individual is held to have been denied a free choice to admit, to deny, or to refuse to answer is what the Supreme Court refers to as a "penalty situation." *Minnesota v. Murphy*, 465 U.S. 420, 435 (1984). If an individual's refusal to answer incriminating questions subjects him to a penalty, then the Fifth Amendment is self-executing and any statements made under threat of such penalty are inadmissible. *Saechao*, 418 F.3d at 1077.

The Supreme Court in *Garrity* held that "loss of job" is a "penalty" that cannot be imposed on the exercise of the Fifth Amendment privilege. *Garrity v. New Jersey*, 385 U.S. 493 (1967). In *Garrity*, a state employer questioned its employees and informed them of their right to remain silent—and that if they exercised it, they would be fired. *Id.* at 494. Faced with the choice "either to forfeit their jobs or incriminate themselves," the employees confessed. *Id.* at 495, 497. The Court held that the state may not put its employees in this penalty situation and reversed their convictions. *Id.* at 497–98.

The *Garrity* Court reasoned that the choice between incriminating oneself and suffering the threatened penalty, such as loss of a job, is "the antithesis of free choice to speak out or to remain silent." 385 U.S. at 497.[2] Accordingly, the *Garrity* rule, like *Miranda*, is prophylactic. *Chavez v. Martinez*, 538 U.S. 760, 768 (2003) (plurality opinion) (observing that the "immunity [secured by *Garrity*] is . . . a prophylactic rule we have constructed to protect the Fifth Amendment's right"). Where the government has created a penalty situation, the inquiry is no longer whether

---

[2] The "loss of job, loss of state contracts, loss of future contracting privileges with the state, loss of political office, loss of the right to run for political office in the future, and revocation of probation all are 'penalties' that cannot be imposed on the exercise of the privilege." *United States v. Frierson*, 945 F.2d 650, 658 (3d Cir. 1991) (collecting cases).

8

1   the criminal defendant asserted his privilege when he was questioned (itself a proxy for whether

2   his answer was compelled); instead, the privilege is said to be "self-executing" and may be

3   claimed after the fact. *Murphy*, 465 U.S. at 436.

## II. THE *GARRITY* RULE

For the *Garrity* rule to apply, the government must have created a penalty situation—it must have made some sort of threat. *Murphy*, 465 U.S. at 435. A penalty situation is created if there is a "reasonable basis for concluding that [the state] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Id.* at 437. A state creates a classic penalty situation if it "expressly or by implication" suggests "that invocation of the privilege would lead" to a penalty. *Id.*

Courts have applied two different legal standards to determine whether a defendant is coerced into waiving his Fifth Amendment rights – the *Indorato* test and the subjective/objectively reasonable belief test. The First Circuit in *United States v. Indorato*, held that a *Garrity* violation occurs when (1) the person being investigated is *explicitly told* that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment . . . and (2) there is a statute or municipal ordinance mandating such procedure." 628 F.2d 711, 716 (1st Cir. 1980) (emphasis added). The government argues that this test is applicable, but the *Indorato* decision predates the Supreme Court's decision in *Murphy* in 1984, in which the Court held that a classic penalty situation can arise either "expressly *or by implication*." *Murphy*, 465 U.S. at 435 (emphasis added); Oppo. 8. The Ninth Circuit has also rejected argument that penalty only arises when the state *expressly* announces a penalty, finding that such an interpretation "is contrary to the plain language of the Supreme Court's decision in *Murphy*." *Saechao*, 418 F.3d at 1079.

The relevant test here is the subjective/objectively reasonable test. For statements to be protected under *Garrity*, a public employee "must have in fact believed [the] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." *United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988); *see also United States v. Trevino*, 215 F. App'x 319, 321–22 (5th Cir. 2007); *United States v. Vangates*, 287 F.3d 1315, 1321–22 (11th Cir.

9

2002).

## DISCUSSION

### I. SUBJECTIVE BELIEF

The Supreme Court in *Murphy* undertook both a subjective and objective analysis but expressly declined to decide whether one or the other or both were necessary. 485 U.S. at 437 (holding that there was no penalty situation regardless "[w]hether [the Court] employ[ed] a subjective or an objective test"). The Ninth Circuit in *Saechao* barely discussed the subjective inquiry, and in *Bahr* elided it entirely. *See Saechao*, 418 F.3d at 1077; *United States v. Bahr*, 730 F.3d 963, 966 (9th Cir. 2013).

In his declaration, Ortino states that he believed that he would have been subject to discipline if he refused to cooperate with OIG and that he was mandated to cooperate with OIG under workplace policies that applied to him. Ortino Decl. ¶¶ 3–5. This is enough to satisfy the first prong of the test. The more important question is whether that belief was objectively reasonable under the circumstances.

### II. OBJECTIVELY REASONABLE

While Ortino concedes that the government did not *explicitly* inform him that he would lose his job if he refused to cooperate in his OIG interview, the relevant question is whether it was objectively reasonable for Ortino to think that the threat was *implied* under the circumstances. *Murphy*, 465 U.S. at 435. According to Ortino, DiNucci's instructions leading up to the interview and DHS' rules and directives regarding OIG interviews confirm that Ortino reasonably believed that he would lose his job if he did not answer the agents' questions. Mot. 11. Accepting Ortino's version of the facts for purposes of this motion, I find that it was not objectively reasonable for him to think that he was compelled to cooperate. The DHS OIG Directive explicitly states that cooperation is not necessary if one is suspected of committing a criminal offense and nothing DiNucci said to Ortino contradicted that regulation. Ortino had surrendered his service weapon, was placed under arrest before the interview, and knew he was facing criminal consequences before he decided to answer questions. He was not implicitly or explicitly compelled to do so.

Ortino argues that DiNucci directed him to come to the San Francisco Customs House on

April 2, 2019 to talk about the "Vann thing," but only upon his arrival did he tell him the real reason he was there was to talk to DHS OIG. Ortino Decl. ¶ 3. He claims that DiNucci instructed him that he could not leave and ordered him to speak with DHS OIG and to tell them the truth. *Id.* ¶ 4. He felt that he was not in the position to disobey these instructions because DiNucci "made no reference to the DHS rule that would have allowed [him] to invoke his right to silence without any penalty to his employment." Mot. 11 (referring to the exception in the DHS Management Directive 810.1 for those who are "subject of an investigation that can lead to criminal prosecution").[3]

DHS Management Directive 810.1 states that CBP cannot fire an employee for refusing to answer questions from OIG when he or she is "the subject of an investigation that can lead to criminal prosecution." Urhausen Decl., Ex. L (stating that DHS employees will "[b]e subject to disciplinary action for refusing to provide documents or information or to answer questions posed by investigating officials or to provide a signed sworn statement if requested by the OIG, *unless questioned as the subject of an investigation that can lead to criminal prosecution*.") (emphasis added). Ortino claims that DiNucci told him to tell the truth, but that does not implicitly compel him to testify. The Supreme Court has contrasted an order merely to be "truthful," which does not compel testimony, with an order to "cooperate," which demands more of the reasonable employee. *Murphy*, 465 U.S. at 437 (observing that "Murphy's probation condition [to be truthful] proscribed only false statements"). Nothing DiNucci did contradicts the DHS Directive or the *Garrity* rule.

Ortino does not deny that he surrendered his service weapon and was placed under arrest before the agents began questioning him. Ortino Decl. ¶ 4 ("At some point in the discussion, [DiNucci] told me to give him my service belt, including my service weapon, and I gave it to him."); *see also id.* ¶ 5 ("I waited approximately 45 minutes in Director DiNucci's office.

---

[3] The government contests these allegations. DiNucci claims that he never told Ortino that he had to cooperate with DHS OIG and never threatened to punish Ortino if he did not cooperate with DHS OIG. DiNucci Decl. ¶ 9. He claims that he "explicitly told [Ortino] that he did not have to talk if he did not want to do so and that it was his choice whether or not to talk to the OIG" and that "if he did decide to talk he should tell the truth and that he should get a lawyer if he wanted one." *Id.* ¶ 10.

11

1    Director DiNucci then took me to a different room, where three agents were waiting. One of them
2    told me I was under arrest and read me my rights. After about 10 minutes, the OIG and DOL
3    agents arrived."). He received a *Miranda* warning. He is a law enforcement officer who would
4    generally know the consequences of being arrested. It is not objectively reasonable, as the
5    government points out, that "although he was under arrest and facing a possible felony conviction
6    and prison term, he participated in his post-arrest interview, made inculpatory statements, and
7    jeopardized his freedom all because he thought that he would lose his job if he remained silent."
8    Oppo. 12.

9    While there is no precedent directly on point, the reported case law supports the
10   government's position. For example, in *United States v. French*, the court denied a police
11   officer's motion to suppress statements made during two Federal Bureau of Investigations ("FBI")
12   interviews regarding drug trafficking. 216 F. Supp. 3d 771, 776 (W.D. Tex. 2016), *aff'd,* 708 F.
13   App'x 205 (5th Cir. 2018). French had a brief conversation with his supervisors, who then
14   directed him to a conference room where FBI agents were waiting. *Id.* His supervisors told him
15   to "make himself available to the command staff and investigation." *Id.* French testified that he
16   knew police officers generally cooperate with investigations. *Id.* One of the FBI agents
17   "specifically stated that the interview pertained to a criminal investigation." *Id.* "No [police
18   department] personnel were present during the interview." *Id.* Although his supervisors asked
19   him earlier to sign a document that required him to turn in his badge, firearm, and other police
20   equipment, French maintained possession of his firearm, baton and pepper spray throughout the
21   interview. *Id.* He testified that he did not think he was in custody during the interview. *Id.*
22   Several days after the first interview, FBI interviewed French again and administered a polygraph
23   examination. *Id.* Ultimately, the court found the circumstances made it clear that "French was not
24   faced with the Hobson's choice of either making an incriminating statement or being fired." *Id.* at
25   777 (internal quotation marks and citation omitted).

26   The circumstances in French's first FBI interview closely match what Ortino claims
27   happened here. Both met with a supervisor, who then led them to interview with investigating
28   agents. Their supervisors were not present during the investigative interviews. Although French

actually maintained possession of his service weapons, he signed an affidavit and knew he would be turning them in soon. Similarly, DiNucci instructed Ortino to turn in his service weapon. The agent in French's interview specifically told him that it involved a criminal investigation. Ortino was not only told that, but he was also placed under arrest on the criminal charges prior to the interview. Like French, he did not face the Hobson's choice of either making an incriminating statement or being fired.

Ortino's situation also differs from cases where courts have granted motions to suppress under *Garrity*. Courts have found that a compulsion situation is created when investigative agents imply that they can help defendants save their jobs if they cooperate. *See, e.g.*, *Zeigler v. State*, 350 Ga. App. 716, 723 (2019) (granting motion to suppress statements made after agents said they were "trying to help" defendant save her job); *State v. Socarras*, 272 So.3d 488, 495 (Fla. Dist. Ct. App. 2019) (granting motion to suppress statements made after agent said "we have to make this look like an isolated incident if you want to try to maintain your position in narcotics"). It can be created more explicitly. *See State v. Graham*, 136 Ohio St. 3d 125 (2013) (granting motion to suppress where defendants received a "Notice of Investigatory Interview" beforehand that informed them that their refusal to cooperate could subject them to discipline); *State v. Aiken*, 281 Ga. App. 415, 418, (2006), *aff'd,* 282 Ga. 132 (2007) (granting motion to suppress where defendant, who worked as a state probation officer for 17 years, was given a "Notice of Interfering with On-Going Internal Investigation" that stated he was required to participate or face disciplinary action).

Ortino does not allege that agents compelled him to speak. Indeed, Agent Roberson states that she informed him "several times that he did not have to continue his post-arrest interview or answer [their] questions and that he could call an attorney," but he "always voluntarily chose to continue his interview." Roberson Decl. ¶ 7; *see also* Urhausen Decl., Ex. J (DOL interview report of Ortino stating that he signed a Miranda waiver to continue the interview, refused having an attorney present several times, and stated that he "just wants to be honest").[4]

---

[4] Ortino asserts that his *Miranda* warnings were insufficient and that he should have received *Garrity* warnings as well. It is true that the *Garrity* court itself found that a *Miranda* warning is

13

Ortino also argues that as a long-time CBP employee, he was "well aware that if an employee was asked to talk to OIG, that employee was expected to cooperate. If an employee does not cooperate with OIG, he knew that he or she can be disciplined, up to and including termination." Mot. 11. That may well be his subjective belief, but the DHS policies Ortino refers to are to the contrary; employees who are the subject of a criminal investigation are not required to cooperate.

While Ortino concedes that the DHS policies contain Management Directive 810.1, he contends that there is "no reason to conclude that [he] and other employee witnesses in this case would in the ordinary course know about *Garrity*, or DHS' articulation of *Garrity*." Reply in Support of Motion to Suppress [Dkt. No. 34] 7. He points out that other employees in this investigation received the *Garrity* warning, showing that DHS OIG knew employees would not know about *Garrity* in the ordinary course. *Id.* But they were not in custody or subject to an investigation that may lead to criminal prosecution. In fact, "[a]ccording to CBP records, since 2010, CBP has not fired anybody for refusing to cooperate with a DHS OIG or a CBP Office of Professional Responsibility investigation." Roberson Decl. ¶ 12. Ortino can point to no fact that shows that the government by implication required him to testify.

Ortino analogizes to *United States v. Goodpaster*, where the district court suppressed statements a United States Postal Service ("USPS") employee made to OIG who was investigating theft of parcels containing prescription drugs. 65 F. Supp. 3d 1016, 1019 (D. Or. 2014). The day before the OIG interview, a grand jury indicted Goodpaster for two counts of mail theft; it was contested whether the OIG agents told Goodpaster he had been indicted during the interview. *Id.* Before the interview began, OIG agents gave Goodpaster his *Miranda* warnings but did not provide *Garrity* warnings. *Id.* at 1020. During the interview, OIG agents "described to Goodpaster the evidence they had amassed against him, including the video evidence," and

---

insufficient to dispel the compulsion inherent in the employment penalty for silence. *Garrity*, 385 U.S. at 494. But defendants seeking to suppress statements taken in violation of *Garrity* are required to prove that they had both a subjective and objectively reasonable belief that they were compelled to answer under the threat of termination. Ortino has not met that burden here.

14

"informed Goodpaster of the consequences of his thefts on other veterans who needed their prescription medicines." *Id.* Goodpaster confessed that he stole packages from the mail and wrote a written statement of his confession, after which he was handcuffed and placed under arrest. *Id.*

There are two significant distinctions between the facts in *Goodpaster* and this case. The USPS OIG guide in *Goodpaster* provided that USPS employees are to "cooperate" in USPS OIG investigations. It did not provide an exception for employees who were the subject of a criminal investigation, unlike the DHS OIG regulation. *Goodpaster*, 65 F. Supp. 3d at 1020. Further, when Goodpaster was initially hired by USPS, he signed a document acknowledging that he understood that if he violated USPS's policy to "cooperate" in OIG investigations he could be subject to administrative discipline. *Id.* The court found this dispositive in making Goodpaster's belief that he would be fired if he failed to answer questions objectively reasonable. The state created a penalty situation and did not provide an assurance that adequately retracted its prior threat. *Id.* at 1031.

Ortino was not under a duty to cooperate. He was not given some type of notice before the interview that would make it objectively reasonable for him to think he was compelled to answer under threat of termination; Management Directive 810.1 was to the contrary. He was under arrest and knew he had the right not to incriminate himself. While Ortino may have had a subjective belief that he had to answer questions or face termination, the government did nothing by implication to require his testimony. His belief that he was compelled to answer DHS OIG agents' questions was not objectively reasonable. A *Garrity* warning was not necessary in addition to the *Miranda* warning.

**CONCLUSION**

Accordingly, Ortino's motion to suppress statements and derived evidence is DENIED.

**IT IS SO ORDERED.**

Dated: December 3, 2019

William H. Orrick
United States District Judge

15